UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CASE No.:

| | |
|---|---|
| ESTATE OF KATHERINE M. VICKERS and RUPA VICKERS RUSSE, Individually and as Executor of the ESTATE OF KATHERINE M. VICKERS,<br><br>               Plaintiffs,<br>v.<br><br>UNITED STATES OF AMERICA,<br>Department of Veterans Affairs<br>               Defendant, | Case: 1:22−cv−03860<br>Assigned To : Moss, Randolph D.<br>Assign. Date : 12/26/2022<br>Description: Pro Se Gen. Civ. (F−DECK) |

## COMPLAINT

COMES NOW, Plaintiffs Rupa Vickers Russe, individually, and as Executor of the Estate of Katherine M. Vickers, deceased, ("Plaintiffs") and files their Complaint against the United States of America, its officers, agents, employees, and representatives (Defendant), alleges and states as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Katherine M. Vickers (hereinafter "Ms. Vickers") was a veteran of the United States Navy who was honorably discharged. On 08/03/95 Ms. Vickers was granted 100% service connected disability benefits, which included 100% healthcare provided by the Veterans Administration Medical Centers (hereafter "VAMC"). Ms. Vickers' disability designation by the VA is attached as Exhibit L.

2. During the 1990s Ms. Vickers began receiving all her medical care at the District of Columbia Veterans Administration Medical Center facility (hereafter "DCVAMC"). Ms.



RECEIVED
DEC 26 2022
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

Vickers received all of her medical care at WDCVAMC until approximately December 2006.

3. This is an action brought pursuant to the Federal Torts Claim Act. Plaintiffs' claims were timely presented to the Department of Veterans Affairs (hereafter "VA"), within two years of Plaintiffs' first notice of injury due to negligent medical care at the WDCVAMC in 2020, via an executed SF-95 form mailed on 12/08/21 to the VA Regional Office for the District of Columbia. Defendant acknowledged receipt of that administrative claim on 01/17/21. A copy of that 2021 claim and receipt is attached as Exhibit "A".

4. The VA denied the Plaintiffs 2021 claims by letter dated 06/27/22, which Plaintiffs received in September 2022. A copy of the final denial letter for the 12/08/21 administrative claim is attached as Exhibit "B". The VA's determination was that the Plaintiffs claims accrued on February 01, 2021. This complaint is filed within six months of that denial, in conformance with 28 U.S.C. § 2401(b), and the District of Columbia's D.C. Code § 12–301(a)(3). Plaintiffs first notified Defendant of Plaintiffs' intention to file the present claims prior to July 2020 by filing their administrative claims and by sending a copy of the July 2020 complaint to Defendant, pursuant to D.C. Code § 16–2802.

5. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1346(b) (Federal Tort Claims Act) and 28 U.S.C. § 1331 (Federal Question).

6. Ms. Vickers was held to be a resident of Madison County, North Carolina at the time of her death. No real property is involved in this action. EXH K.

7. The acts and omissions that are subject of this action first occurred at the WDCVAMC, and possibly other locations where VA scheduling and fee service approvals occur.

Therefore, venue in this Court is appropriate pursuant to 28 U.S.C.A. § 1402(b) and 28 U.S.C.A. 1391(b)(1) and (2) (e)(1)(A) and (B).

## PROCEDURAL HISTORY

*FTCA Claim Procedural History and Pending WNC Court Complaint*

8. In April 2019 Plaintiff Russe was appointed Ms. Vickers' Executor of her Estate, pursuant to Ms. Vickers' duly executed Last Will and Testament. The Letters Testamentary are attached as Exhibit "K".

9. Pursuant to 28 U.S.C. §2401(b), Plaintiffs submitted their original SF-95 administrative claim against the VA in October 2019, within two years after the death of Ms. Vickers. Plaintiffs mailed their administrative claim to the regional office for the jurisdiction in which Ms. Vickers' received her primary care at the time of her death, the Winston-Salem VA claims address. In the October 2019 claim Plaintiffs wrote,

   a. "[Ms.] Vickers, a 100% service connected disabled veteran who received all her medical care at VA facilities since receiving her service connected disability [ . . . ] NeuroOncologists at [Duke] confirmed Ms. Vickers had an oligodendroglioma brain tumor that went undiagnosed for a possible maximum ten (10) years [ . . . ] 9. Claimant died as a result of the negligent and medical malpractice and care [ . . . ] 10. [Ms.] Vickers suffered during the last decade of her life due to an undiagnosed slow-growth, oligodendroglioma, brain tumor that had grown to almost half the size of her brain by the time of diagnosis, all while under the VA's care as a 100% service-connected veteran of the Navy [ . . . ] the caretaking she received by the VA Dr.'s, inducing Dr. Hume, in failing to diagnose her brain

tumor, although they were on notice since at least 2015 that her mental behaviors were changing, was malpractice[.]" The claim included the requisite "amount of claim" damages. This first administrative claim is attached as Exhibit "J".

10. Having not received any decision, and with F.T.C.A. and state statutes of limitations running, pursuant to 28 U.S.C. 2401(b), Plaintiffs filed their complaint on 07/16/20 in the United States District Court for the Western District of North Carolina (hereafter "WNC Court"), Russe et al v. United States, case no. 20-cv-92. This complaint contained allegations against the WDCVAMC for medical malpractice and wrongful death under the implied notice of injury suffered at WDCVAMC that Plaintiffs received in May 2020 when they discovered that abnormalities had been discovered in Ms. Vickers' 2002 and 2003 radiology brain scans, and based on the doctrine of res ipsa loquitur as there was at the time the complaint was filed a belief by the WDCVAMC records department that those radiology images had been lost, and Plaintiffs had no doctor's notice that the brain tumor was identifiable in the 2002 and 2003 radiology images.

11. Defendant first responded to the October 2019 administrative claim in a letter dated 07/22/20, in which it stated, "[s]ince you have filed suit in the [WNC Court], we have determined that the claim is not amenable to administrative resolution. Accordingly, we must deny your claim. This notice constitutes final administrative action on this claim under the [F.T.C.A.]". Defendant's final denial letter is attached as Exhibit "O".

12. In September 2020 Plaintiffs first were provided the WDCVAMC radiology images. Upon receipt of the radiology images Plaintiffs contacted neuro-oncologist Dr. Henry S. Friedman, at the Robert Tisch Brain Cancer Center at Duke Hospital in Durham, NC (hereafter "Duke"), who read the WDCVAMC 2002, 2003 radiology images. Dr. Henry

S. Friedman confirmed in an affidavit to the WNC Court that the WDCVAMC radiology images disclosed the presence of the tumor, and that without the images it would have been impossible to know of the WDCVAMC's failure to diagnose the brain tumor, based on the written radiology reports alone. Dr. Friedman's affidavit is attached as Exhibit "G".

13. On 01/06/21 Defendant filed a motion to dismiss all claims in the WNC Court. On 12/06/21 the WNC Court denied dismissal of the Plaintiffs' claims against the Charles George VA Medical Center (hereafter "CGVAMC"), and granted dismissal of the claims against the WDCVAMC for failure to exhaust administrative remedies as the October 2019 claim did not include reference to specific incidents at the WDCVAMC.

14. Plaintiffs filed their 12/08/21 administrative claim identifying specific claims against the WDCVAMC. Attached as Exhibit "A", *infra* ¶ 3. This claim included the following,

    a. "On [09/10/20] WDCVAMC was able to locate the radiology records of [Ms.] Vickers, upon subsequent review of those radiology records, specifically the radiology images dated 10/22/03 and 4/24/03 , Dr. Henry Friedman, world renowned neuro-oncologist, diagnosed that those two radiology images disclosed a brain tumor that should have cause[d] diagnosis and follow-up care for a brain tumor [ . . . ] [Ms.] Vickers was diagnosed with an oligodendroglioma brain tumor that was over half the size of her brain in July 2017. In November 2017, Mrs. Vickers' neuro-oncologist, Dr. Dina Randazzo, at [Duke], diagnosed that the brain tumor was at least 5 years old, and maybe as old as 10 years old [ . . . ] at all times prior to and until Dr. Henry Friedman's November 2020 diagnosis of the WDCVAMC radiology record images, [Ms.] Vickers, her treating physicians and

her Estate were told the disease started while [Ms.] Vickers was being seen by Doctors at the CGVAMC. However, the newly released (on [09/10/20]) radiology images show that the disease was clearly indicated in the 10/22/03 radiology images that were taken by the WDCVAMC as ordered by on at least one occasion Dr. Ballish." The claim included the requisite "amount of claim" damages.

15. Defendant issued its final denial of Plaintiffs' 12/08/21 claim on 06/27/22 stating that Plaintiffs claims accrued "when you became aware of Veteran's diagnosis and who inflicted the injury, requiring you to have filed your claim by February 1, 2021." Defendant's denial is attached as Exhibit "B", *infra* ¶ 4.

16. Plaintiffs filed an appeal on February 04, 2022 in the Fourth Circuit for the dismissed claims against the WDCVAMC on the grounds that: (1) the F.T.C.A. only requires a claimant to provide as much information they have at the time of the administrative claim presentment in order to put the agency on notice of the injury; and (2) that the F.T.C.A. makes no statement that an injury must specify the specific facility that caused the harm in the presentment standard, merely the agency. The Fourth Circuit denied Plaintiffs' appeal as interlocutory, not final nor collateral. The Fourth Circuit's Order is attached as Exhibit "F".

17. On 12/18/22 in an effort to understand Defendant's statement in their denial that Plaintiffs would have had notice in February 2019 that a WDCVAMC provider "inflicted the injury", Plaintiffs requested Defendant Attorney Penny Kahn provide the document that supported that determination. Attorney Kahn's response on 12/19/22 was that Plaintiffs could file suit, or request a Reconsideration of the Agency's denial, but did not provide any record. As of 12/19/22, the automatic six months allowed to the Defendant under a

request for reconsideration would have made Plaintiffs complaint untimely under D.C. Code § 12–301(a)(3), and therefore in the interest of judicial economy Plaintiff made a second request for Attorney Kahn to provide the documentation that supported the Agency's determination that Plaintiffs' had notice of the WDCVAMC provider who "caused the injury" in February 2019. In her final response on 12/21/22 Attorney Kahn restated that the claim was "untimely" and did not disclose any documents in support of their denial determination. Plaintiff Russe's email communications with Attorney Kahn are attached as Exhibit "P".

18. Pursuant to 28 U.S.C. § 2401(b), Plaintiffs file this complaint against the WDCVAMC within six months of Defendant's final denial of Plaintiffs' 12/08/21 administrative claim.

## FACTUAL ALLEGATIONS

19. Katherine M. Vickers served in the United States Navy during the Korean War and was honorably discharged on 12/18/53. Ms. Vickers' disability designation is attached as Exhibit "L".

20. Ms. Vickers was granted 100% service-connected disability benefits during the 1990s due to a service-connected injury while she served in the Navy.

21. From sometime in the 1995 until 2006 Ms. Vickers' received all her medical care at the WDCVAMC.

22. Ms. Vickers died on October 16, 2018 in Raleigh, North Carolina due to complications related to her brain tumor and the secondary symptoms it caused. She was 83 years old.

23. Ms. Vickers' mother lived into her 90s and her father lived until he was 87.

24. At all times from 2017 until her death, Ms. Vickers' was suffering from a brain disease which rendered her incompetent pursuant to N.C.G.S. § 1-17(c).

25. From sometime prior to 2000 until her death on October 16, 2018 Ms. Vickers received all her medical care at VA medical care facilities, or by referral ordered by the treating VA facility to community care centers, pursuant to Ms. Vickers' VA granted 100% service-connected disability healthcare benefits which are not anticipated to be the subject of dispute in this case.

*Ms. Vickers' 2017 Diagnosis*

26. In Fall 2017 Ms. Vickers' was diagnosed with a slow growing brain tumor. At no time prior to this diagnosis had Ms. Vickers' been informed that any growths were found or suspected in her brain.

27. Upon information and belief, at no time after October 2003 did any VA facility order a brain scan of Ms. Vickers' brain, even though her symptoms persisted and worsened.

28. In Fall 2017 at the time Ms. Vickers' brain mass was first discovered, CGVAMC referred her to Duke for specialty neuro-oncology diagnosis and treatment. Ms. Vickers' duly executed 08/02/17 "Authorization for Use and Disclosure of Protected Health Information" release was uploaded into Defendant CGVAMC's records on 08/28/17. At the time Duke was attempting to diagnose Ms. Vickers' tumor, Ms. Vickers' executed a medical release form that allowed all her medical providers, including Duke, to have access to her complete medical record. At Ms. Vickers' first Duke appointment in August 2017, to give her her diagnosis and plan her treatment, her Duke medical providers informed her that the CGVAMC had failed to provide any medical records that showed any prior neurological care. At that appointment, Duke diagnosed that Ms. Vickers' brain tumor had been growing for a maximum of 10 years, at no time thereafter was that

diagnosis changed during Ms. Vickers' life. Ms. Vickers' Authorization is attached as Exhibit "R".

29. At the time the tumor was discovered in 2017, it filled one section of the frontal lobe and had begun to spread to the other section of the brain. All Ms. Vickers' medical providers deemed the tumor unresectable at the time of discovery due to its substantial size. Ms. Vickers' Duke medical providers recommended chemotherapy, which was begun in Fall of 2017.

30. The chemotherapy treatment, temozolomide, was very successful and by Summer 2018 June 2018 followup CT scans disclosed that the brain tumor was smaller and that "presumably it is working". CGVAMC medical record supporting this statement is attached is Exhibit "Q".

*Plaintiffs' First Notice of WDCVAMC Injury and Lost Radiology Images*

31. Plaintiff Russe first requested the WDCVAMC medical records in Spring 2020 in anticipation of filing a well-pleaded complaint against the CGVAMC. WDCVAMC first mailed its written medical records to Plaintiff Russe in May 2020. Those records first disclosed to Plaintiff Russe the years of neurological medical care Ms. Vickers had received at WDCVAMC as stated herein. This was also the first notice Plaintiff Russe had that radiology images had been taken by WDCVAMC in 1999, 2002, and 2003 of Ms. Vickers' brain.

32. Although the entire WDCVAMC medical record was requested in Spring 2020, the May 2020 WDCVAMC disclosed records did not include any radiology images. After reading the written WDCVAMC radiology reports which stated abnormalities were identified in

the 1999, 2002 and 2003 records, Plaintiff Russe immediately contacted the WDCVAMC medical records department to request the radiology images.

33. In June 2020 Plaintiff Russe was informed by WDCVAMC medical records staff member, believed to be named, "Mrs. Black" that the radiology records department believed they had lost the images. Plaintiff Russe spoke with Mrs. Black on multiple occasions between May and September 2020, and each time Mrs. Black informed Plaintiff Russe that the images were believed to be lost and that she could not disclose the direct contact information of the radiology records department to Plaintiff Russe.

34. On 09/08/20 Mrs. Black first disclosed the email address for WDCVAMC radiology records department director Joseph Stenz, and informed Plaintiff Russe to contact him directly. Plaintiff Russe sent her first direct email to Mr. Stenz that same day. Plaintiff Russe first received the WDCVAMC radiology images of Ms. Vickers' brain in September 2020. A copy of the emails between Plaintiff Russe and Mr. Stenz are attached as Exhibit "E".

35. Plaintiffs' first received actual notice that the 2003 Radiology images disclosed the presence of the brain tumor when they had the September 2020 disclosed radiology images read by a neuro-oncologist in the Fall of 2020.

*Other Relevant Medical Treatment History: CGVAMC*

36. From December 2006 through 2010, and again from 2012 until Ms. Vickers' death, she received all of her medical care at, or coordinated by, the CGVAMC in Asheville, North Carolina.

37. At no time while Ms. Vickers' was a patient at the CGVAMC was any brain scan performed.

38. On July 21, 2017 Ms. Vickers was taken to the CGVAMC ER suffering from acute medical symptoms that both Ms. Vickers and Plaintiff Russe assumed were caused by Ms. Vickers' then-recent prescription of insulin by medical providers at the CGVAMC. Upon admission, the CGVAMC ER ran CT scans and discovered an unidentified mass in Ms. Vickers' brain that was over half the size of her brain. The CGVAMC ER immediately sent Ms. Vickers to the Mission Hospital in Asheville, NC by ambulance that same night to have an MRI conducted.

39. Following a biopsy conducted on July 27, 2017 at the Mission Hospital, CGVAMC referred Ms. Vickers' to Duke to be given a diagnosis and to receive treatment. In August 2017 Ms. Vickers was first informed by her treating neuro-oncologists at Duke that she was suffering from a slow growing oligodendroglioma brain tumor that they believed had been growing between a minimum of 5 years and a maximum of 10 years, which gave Plaintiffs notice the tumor was only growing since 2007, during her care at the CGVAMC. This diagnosis is reported in Plaintiffs' 2019 administrative claim, attached as Exhibit "J", and in the Plaintiffs' expert witness neuro-oncology report, attached as Exhibit "C".

40. Plaintiff Russe requested Ms. Vickers' complete medical records from the CGVAMC in 2019. Plaintiffs were provided what was purported by CGVAMC to be a complete record in September 2019. It did not contain any records from other VA facilities, and in the Summer of 2022 during discovery in the pending WNC Court case, Plaintiffs learned that additional, substantive and relevant medical records had not been disclosed in 2019.

*WDCVAMC Treatment History*

41. From prior to 2000 until 2006 Ms. Vickers received all her medical care at, or as coordinated by, the WDCVAMC, pursuant to Ms. Vickers' granted 100% service-connected disability healthcare benefits.

42. Ms. Vickers' stopped being a patient of the WDCVAMC in 2006, and had her first primary care appointment at the CGVAMC in December 2006. Ms. Vickers' first appointment note at the CGVAMC for primary care is attached as Exhibit "M".

43. During Ms. Vickers' care at the WDCVAMC the WDCVAMC medical records shows she complained of recurring dizziness, headaches, different types of pain, and displayed mood changes; the medical record shows no clear diagnosis was made for the cause of these symptoms.

44. From at the latest 2001 until 2006 WDCVAMC appointed Dr. Marshall Ballish, Assistant Chief of Neurology at the WDCVAMC, to serve as Ms. Vickers' primary care provider.

45. The WDCVAMC medical record states that Ms. Vickers' underwent an MRI on 03/29/99 which the WDCVAMC records department states they no longer have the images or the written report for that radiology scan in their possession. A neuropsychology note entered by WDCVAMC employee Heidi Donovan on 05/16/01 in Ms. Vickers' WDCVAMC medical record states that that MRI "of the head (3/29/99) demonstrated "mild sulcal prominence consistent with age".

46. Dr. Ballish ordered multiple radiology images from between 2002 and October 2003. These include:

    a. On 10/22/03 an MRI Brain without contrast scan was requested by Dr. Ballish at the WDCVAMC, "please do fu mri of brain pt with recent episode of left facial

      numbness and pain with left horners please do mri brain." WDCVAMC radiologist Alexander S. Mark wrote the written report on 10/24/03 and stated, "FINDINGS: The ventricles and sulci are normal The study demonstrates an area of abnormal signal intensity in the left inferior frontal white matter most likely representing post traumatic encephalomalacia." No followup MRI with contrast was ordered.

    b. 04/24/03 an MRI Brain without contrast scan was ordered by Dr. Marshall Ballish, "pt with worsening cognition no lateralizing findings please do mr brain." WDCVAMC radiologist John M Athas wrote in the written report on 4/26/03, "Prior MRI dates 03/26/99 is available for comparison. There is left inferior frontal periventricular white matter T2 hyperintensity, which is non-specific". No followup MRI with contrast was ordered.

    c. 01/28/02 Dr. Marshall Ballish ordered a CT Head without contrast at the WDCVAMC, "pt with new predominant right sided headache." WDCVAMC radiologist Insook Yoon, M.D. wrote in the written report on 1/29/02, "There is cortical atrophy seen, especially at the high convexity [ . . . ] Minimal cortical atrophy."

47. In the case presently pending in the WNC Court, CGVAMC's designated Fed. R. Civ. P. 26(e) expert witness, Neuro-radiologist, Dr. Gordon Sze wrote in his expert witness report, "[W]ithin a reasonable degree of medical certainty, the imaging examinations of Katherine Vickers from 2002 and 2003 disclose an extensive, infiltrative, unresectable tumor." Dr. Sze's 2022 expert witness report is attached at Exhibit "I".

48. In the case presently pending in the WNC Court, CGVAMC's designated Fed. R. Civ. P. 26(e) expert witness Neurosurgeon Dr. Julian Bailes testified in his deposition that there was something evident in Ms. Vickers' WDCVAMC brain radiology scans in her frontal lobe that the standard of care would be a followup MRI "with contrast", something that was never ordered by WDCVAMC medical providers. Dr. Julian Bailes' deposition testimony is attached as Exhibit "H".

49. Plaintiffs' 26(e) rebuttal expert witness Dr. Farr Ajir, neurosurgeon, wrote in his rebuttal report submitted to the WNC Court in the pending case against the CGVAMC that,

    a. "[Ms. Vickers'] MRI of the brain in 2003 was abnormal, and definitely one of the differential diagnoses was possibility of a slow growing glioma. The radiologist who read the MRI did not consider a slow growing glioma in the differential diagnoses. The radiologist should have recommended an MRI with contrast [ . . . ] 3. If she had been referred to a neurologist or had follow up MRI, her slow growing brain tumor could have been diagnosed much sooner, and she could have received appropriate surgical and non-surgical treatments promptly. 4. As a result of the delay in early diagnosis of her slow growing brain tumor, she suffered from multiple agonizing symptoms for many years. In summary, it is my opinion, her providers at the VA facilities deviated from the standard of care by failing to diagnose and treat a growing brain tumor." Dr. Farr's report is attached as Exhibit "S".

50. The WDCVAMC medical record includes a note dated 05/16/01 entered by WDCVAMC employee Heidi Donovan, that states "[Ms. Vickers] indicated her family is the focus of her life and that she is very close with all of her children."

51. The WDCVAMC medical record includes a note written by Dr. Marshall Ballish on 04/29/05 that states, "Feels under stress - "mind crunch" - difficulty with her daughter who is even refusing to let her see her grandchildren."

52. In Plaintiff Russe's 09/09/22 deposition she testified that, in "2005, 2006, sometime in there" Ms. Vickers' behaviors became "really targeting" that were "exhausting and needlessly dramatic" "disdain[ful]" of Plaintiff Russe, and that the behaviors posed a risk to Plaintiff Russe's young children because "I could not have an adult around children who was tageting one or the other either emotionally, alienating them because of her perceptions, or literally wanting to discipline them because of her perceptions. It was unsafe." and "Balancing her impact on my children was a primary motivator. And also on me. Targeting me. This was after the pedophilia accusation." Plaintiff Russe's deposition is attached as Exhibit "U".

53. The CGVAMC medical records following Ms. Vickers' diagnosis of the brain tumor, from 2017 until her death, indicate a woman who suffered from mood disorder, disinhibited behavior that resulted in her being blacklisted by the Community Nursing Home facilities and becoming difficult for the CGVAMC to find a CNH to place Ms. Vickers in. A 2018 note addressing the issue of Ms. Vickers' behaviors and relationship to the brain tumor's location in her frontal lobe is attached as Exhibit "T".

### CAUSE OF ACTION AGAINST UNITED STATES

54. As alleged herein, various personnel at the WDCVAMC were negligent in regards to the care and treatment of Ms. Vickers, including but not limited to:

　　a. Failing to properly review and diagnose Ms. Vickers' radiology images;

15

    b. Failing to order proper follow-up brain scans when abnormalities were disclosed in Ms. Vickers' radiology images and a differential diagnoses of a brain tumor existed;

    c. Failing to properly handle and care for Ms. Vickers' radiology images thus resulting in delay in diagnosis and treatment of Ms. Vickers' brain tumor;

    d. Failing to diagnose prior to the brain tumor becoming too large to resect;

    e. Being otherwise negligent.

55. As a proximate result of the negligence of VA employees and personnel, Ms. Vickers was injured, suffered severe physical and mental pain and suffering, and died because of injuries the location of the brain tumor caused Ms. Vickers' to suffer from 2002 until 2018, resulting in her weakened immune system and inability to withstand antibiotic treatments while undergoing chemotherapy, which was the only treatment option available to her at the time the tumor was discovered in 2017.

56. As a further proximate result of the negligence of VA employees and personnel, Ms. Vickers' children and grandchildren suffered immense emotional distress, loss of grandmotherly affection and care due to the undiagnosed brain tumor that grew from at least 2003 until 2018.

57. As a further proximate result of the negligence of the VA employees and personnel, Ms. Vickers lost her chance for a cure, and her quality of life was extremely diminished from 2003 until her death 2018.

58. As a further proximate result of the negligence of the VA employees and personnel, Ms. Vickers' suffered immense emotional distress caused by her eviction from her community

nursing home due to her disinhibited behaviors caused by the frontal lobe location of her non-resectable brain tumor.

59. As a further proximate result of the negligence of VA employees and personnel, Plaintiff Russe suffered severe mental pain and suffering due to the distressful relationship, accusations, and targeting behaviors suffered by her due to Ms. Vickers' emotional instability from approximately 2004 until Ms. Vickers diagnosis in 2017.

60. As a further proximate result of the negligence of VA employees an personnel, Ms. Vickers' life expectancy was greatly diminished.

61. The United States of America is liable for the injuries and damages suffered and incurred as a result of the conduct of its employees and/or agents.

62. Plaintiffs allege medical negligence, wrongful death and negligent infliction of emotional distress caused to Ms. Vickers and Plaintiff Russe due to WDCVAMC personnel and/or agents.

## DAMAGES

63. Because of Defendant's negligence, the Plaintiff's have suffered, and continue to suffer, severe injuries, including physical and mental pain and suffering; permanent physical impairment; loss of enjoyment of life; loss of earnings and earning capacity; out of pocket expenses and pecuniary losses. Plaintiffs bring this suit to recover all damages cognizable under the applicable state and federal law resulting from the injuries to them.

64. Because of the negligence of the United States employee healthcare providers, Ms. Vickers sustained damages and injuries including:

   a. Severe pain, suffering and mental anguish;
   b. Health and attendant care expenses;
   c. Physical disfigurement;

d. Prematurely diminished life span;

e. Loss of earning and earning capacity;

f. Loss of care and support of children and grandchildren;

g. Loss of enjoyment of life;

h. Mental impairment;

i. Physical impairment;

j. Out of pocket expenses; and

k. Other pecuniary damages

In addition, Ms. Vickers seeks recovery of all other damages to which she is entitled to pursuant to the applicable state and federal laws.

2. As Healthcare Power of Attorney, daughter and caretaker of Ms. Vickers, Plaintiff Russe, individually incurred damages, including:

   a. Severe Mental anguish;

   b. Loss of parental care and support;

   c. Other pecuniary damages.

In addition, Ms. Russe seeks recovery of all other damages to which she is entitled pursuant to applicable state and federal laws.

3. As the family of Ms. Vickers, individually have incurred damages, including:

   a. Severe mental anguish;

   b. Loss of support and care of their Matriarch, Ms. Vickers; and

   c. Other pecuniary damages, including cash value of Ms. Vickers and loss of earning capacity due to decreased life span.

In addition, the family of Ms. Vickers seeks recovery of all other damages to which they are entitled pursuant to the applicable state and federal laws.

WHEREFORE, Plaintiffs pray as follows:

a) That upon final trial and hearing hereof, Plaintiffs have judgment against the Defendants, for the amount of actual damages; and for such other and different amounts as they shall show by proper amendment before trial; for post judgment interest at the applicable legal rate; and for such other and further relief, at law and in equity, both general and special,

to which the Plaintiffs may show themselves entitled to and which the Court believes them deserving including an amount sufficient to compensate for the special and general economic and non-economic damages incurred as the result of Plaintiffs' injuries and damages, including pain and suffering, medical expenses, funeral costs, lost income, lost financial support, and lost services including care, support and companionship from 2002 until her death in 2018;

b) That judgment be entered against Defendant in excess of $100,000;

c) That the costs of this action be taxed against Defendant; and,

d) That Plaintiffs have such other and further relief as the Court deems appropriate under the circumstances.

Respectfully submitted, this the 27th day of December, 2022.

By: *[signature]*

Rupa Vickers Russe
*Pro Se*/Attorney, NC Bar No. #56893
P.O. Box 213,
Marshall, NC 28753
Tel: (828) 380-9522
Email: RVR@VRLawPLLC.com